UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KELLY VAUGHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00925-SEB-MJD |
| | ) | |
| RADIO ONE OF INDIANA, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT RADIO ONE'S
MOTION FOR SUMMARY JUDGMENT**

This matter comes before us on Defendant Radio One of Indiana, L.P.'s ("Radio One") Motion for Summary Judgment. [Dkt. No. 64.] The motion is fully briefed. [*See* Dkt. Nos. 72, 79.] For the following reasons, we GRANT Defendant's Motion for Summary Judgment.

**Background and Facts[1]**

**Kelly Vaughn's Employment with Radio One.**

Radio One owns and operates various radio stations in the Indianapolis, Indiana area. [Declaration of Jacqueline D. Kindall, Director of Human Resources for Radio One ("Kindall Decl.") at ¶ 2.] During the relevant time period, Radio One employed

---

[1] Plaintiff's "Facts and Circumstances" and "Statement of Material Facts In Dispute" sections in her response brief include statements lacking evidentiary support in the record and unsubstantiated conclusions of law. [*See* Dkt. No. 72 at 1-9.] Federal Rule of Civil Procedure 56(c) requires parties to cite to particular parts of the record in support of their factual statements. Moreover, Local Rule 56-1(d) provides in part: "A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." We have not considered any unsupported fact in ruling on this motion.

approximately 86 employees, one-third of whom were female. [*Id.* at ¶ 6.] At the time of the events giving rise to this litigation, Radio One's entire Human Resources department was female. [*Id.* at ¶ 5.]

Plaintiff Kelly Vaughn was a part-time employee of Radio One as a board operator/on-air talent from May 29, 2012 until July 2012. [Deposition of Kelly Vaughn ("Vaughn Dep.") at 14, Ex. 2; Dkt. No. 72-1 (WTLC Press Release).] At the time she joined Radio One, both Chuck Williams, Vice President and General Manager of Radio One, and Karen Vaughn,[2] the Program Director of WTLC-FM, were enthusiastic about having Ms. Vaughn as part of the Radio One team. [Dkt. No. 72-1 (Karen Vaughn stated, "Kelly is a true radio professional. As a staple within the Indianapolis market, her expertise in broadcast news will be a great addition to the Tom Joyner Morning show. We are elated to have Kelly on our team.") (Chuck Williams stated, "We are very excited to have Kelly join our Radio One Indianapolis team. Her many years of professional News and Service work have helped Kelly become an icon in the market.").] At the time she was hired by Radio One, Ms. Vaughn was also employed by LeSEA Broadcasting, Channel 40. [Vaughn Dep. at 38-39, 41, 62, 68.]

In July 2012, Ms. Vaughn's position changed to a part-time news announcer. [*Id.* at 19-20.] At all times during her employment, Ms. Vaughn was a part-time, at-will employee and reported to her direct supervisor, Program Director Karen Vaughn. [*Id.* at

---

[2] To limit any confusion, the Plaintiff, Kelly Vaughn, will be referred to herein as Ms. Vaughn or Kelly Vaughn. Ms. Vaughn's supervisor, Karen Vaughn, will be referred to by her full name "Karen Vaughn." Kelly Vaughn and Karen Vaughn are not related. [Kindall Decl. at ¶ 6.]

20, 35-36; Kindall Decl. at ¶ 6.]  Ms. Vaughn believed that Krishna Henderson-Hutchinson was also her supervisor for AM radio-related matters.  [Vaughn Dep. at 21-23.]

As a condition of her employment, Ms. Vaughn was required to agree to Radio One's policies and procedures.  [Kindall Decl. at ¶ 7.]  One such policy was Radio One's Business Ethics and Conduct Policy, which provided in relevant part:

- **Full Disclosure:**  Employees must comply in all respects with the Company's conflicts of interest policy. They should endeavor to avoid all conflict situations, whether actual or perceived, as even the appearance of impropriety can be harmful to the Company's reputation.  Employees must make full and timely disclosure of all conflict situations.

[Vaughn Dep. at 30, Ex. 5 (Radio One Business Ethics & Conduct Policy) at page 1 of 6.] An employee's failure to comply with the Business Ethics & Conduct Policy could subject that employee to disciplinary action.  [*Id.* at 30-31; Business Ethics & Conduct Policy at page 4 of 6 ("Disregarding or failing to comply with this policy may subject an employee to disciplinary action, up to and including termination.").]  Ms. Vaughn signed the Radio One Business Ethics & Conduct Policy on June 1, 2012.  [*Id.* at Ex. 5, p. 5-6 ("I hereby represent that I have read this policy and that I understand its terms.").]

Ms. Vaughn also agreed to follow Radio One's Conflicts of Interest Policy.  [*Id.* at 36, Ex. 7.][3]  That policy provided in relevant part:

---

[3] Ms. Vaughn's co-worker, the now deceased Amos Brown, testified that the employee manual he was given in 2000 included the same conflict of interest policy that was in effect in 2012.  [Amos Brown Deposition ("Brown Dep.") at 12.]  Mr. Brown testified that he was never given any instruction regarding the policy beyond the written policy itself.  [*Id.*]

3

The Company expects all employees to conduct their personal affairs in a manner that does not conflict with the interests of the Company. The Company is entitled to its employees' undivided loyalty, and such loyalty may be compromised if an employee's outside activities are in a position to influence or determine the employee's actions for or on behalf of the Company.

. . .

Identifying Conflict Situations

Generally, a conflict of interest may occur if an interest or activity influences or appears to influence the ability of an individual to exercise objectivity or impairs the individual's ability to perform his or her employment responsibilities in the best interests of the Company.

. . .

Actual or potential conflicts of interest may arise from a variety of situations, affiliations and relationships. They may arise from an employee's outside business activities or outside activities with social or charitable organizations, and they may involve an employee's relationship with, or financial interest in, the Company's competitors, vendors, clients, service providers, or business partners.

[*Id.* at 36-37, Ex. 7 at p.1 ("Conflicts Policy").]  Examples of conflicts of interest include: using the Company's name or property to further an employee's personal interests or diverting business opportunities away from the company.  [*Id.* at Ex. 7 at p. 2.]  The Conflicts Policy further provided:

Often, however, conflict situations require affirmative intervention by the Company to determine whether action on the part of the Company is warranted. Such action may include requiring the employee to fully divest himself or herself of the conflicting interest as a condition of continued employment. In certain circumstances, the Company may determine that an employee's conflict is irreconcilable or so inconsistent with the employee's duty of loyalty to the Company that termination of employment is the only reasonable remedy.

[*Id.*]  Like the Business Ethics and Conduct Policy, the Conflicts Policy expressly noted "that any person found to have violated this policy shall be subject to disciplinary action, up to and including termination of employment."  [*Id.* at 37-38, Ex. 7 at p. 3.]  Ms. Vaughn

4

signed the Conflicts of Interest Policy on June 1, 2012. [*Id.* at 6 of 7 ("I hereby represent that I have read this policy and that I understand its terms.").]

**The Amos and Abdul Show.**

In the latter part of 2011, Ms. Vaughn approached the late Amos Brown and "pitched" to him the idea of a TV show for LeSEA Broadcasting ("Channel 40"). [Vaughn Dep. at 15-16; Brown Dep. at 14.] At that time, Mr. Brown was an on-air personality for Radio One, hosting *Afternoons with Amos Brown*, a daily talk show airing on Radio One's WTLC-AM radio station. [Kindall Decl. at ¶ 3, n.1; *see also* Brown Dep. at 31 (Mr. Brown was engaged in the radio industry from 1975 until his untimely death in 2015).] Ms. Vaughn sought to create and produce a TV show called "Amos and Abdul," which would consist of a point-counterpoint debate between Amos Brown and Abdul-Hakim Shabazz on hot-button issues (the "Show"). [Vaughn Dep. at Exs. 9, 16.] Mr. Brown testified that he had not been approached about an Amos & Abdul Show prior to the above-referenced pitch in 2011. [Brown Dep. at 14.] According to Ms. Vaughn, Mr. Brown claimed he had permission from Radio One to do the Show, but, as it turned out, that was not true. [Vaughn Dep. at 101.]

In planning the Show, Mr. Brown met with managers and sales representatives of Channel 40. [Brown Dep. at 30.] Ms. Vaughn purchased the rights to several URLs, including AmosandAbdul.com; TheAmosandAbdulShow.com; and AmosandAbdulShow.com. [Vaughn Dep. at 42, 61-62, Ex. 21.] Ms. Vaughn also created social media pages on Facebook and Twitter using the name and likeness of Amos Brown and photographs of Mr. Brown he had had taken specifically to promote the show. [*Id.*;

5

Brown Dep. at 33-34.]   Generally during this time Radio One relied on Mr. Brown's judgment with respect to the use of his image and name and did not require Mr. Brown to have his Facebook pages or Twitter posts pre-approved by Radio One.  [Brown Dep. at 22, 73-74.]

Ms. Vaughn never received approval from Radio One to create or produce the Amos and Abdul show, purchase URLs with the names Amos and Abdul, or create social media accounts using Mr. Brown's name and likeness.  [Kindall Decl. at ¶¶ 3, 8; Vaughn Dep. at 96-97, 130-32.]  According to Radio One:

> Ms. Vaughn never disclosed her involvement in the TV Show or that she was the Executive Producer to Radio One, never received approval from Radio One to develop the TV Show or use Amos Brown in the TV Show, never received approval to provide these services for one of Radio One's competitors, never received approval to purchase URLs and social media pages using the name and likeness of one of Radio One's employees, Amos Brown, and never received approval to use a Radio One employee to create a Facebook page for the TV Show.

[Dkt. No. 65 at 6 (citing Kindall Decl. at ¶¶ 3, 8; Vaughn Dep. 42:19-25, 43:10-14, 114:23-25, 115:1–8, 115:6–12; Charles Williams Deposition ("Williams Dep.") Williams Dep. 20:4-24, 24:7-25, 25:1-25).]  Ms. Vaughn does not dispute that she acted as the Executive Producer of the TV Show, that she recruited Mr. Brown to the TV Show, that she recruited other Radio One employees to help develop the Show, or that she purchased and owned URLs and social media using the name and likeness of Amos Brown.  [*See* Dkt. No. 79 at 2.]

Ms. Vaughn does contend, however, that Radio One knew about the Amos and Abdul Show prior to its launch.  Khrishna Henderson-Hutchinson, the WTLC AM Program

Director at the time of Ms. Vaughn's hire with Radio One, testified that she was aware in late 2006 or early 2007 that Ms. Vaughn was working on an Amos and Abdul show for Channel 40. [Khrishna Lynese Henderson-Hutchinson Deposition ("Hutchinson Dep.") at 12-13.] Further, in 2012, Ms. Henderson-Hutchinson was informed in passing by Ms. Vaughn that the Amos and Abdul Show was "finally going to happen." [*Id.* at 14.] At the time of Ms. Vaughn's hire, Ms. Henderson-Hutchinson knew that Ms. Vaughn was working for Channel 40 and that "conceptually she had already thought about and talked to [her] about coming up with an Amos and Abdul Show." [*Id.* at 34.] As Radio One points out, at the time of Ms. Vaughn's hire Ms. Henderson-Hutchinson's knowledge of Ms. Vaughn's work on an Amos and Abdul Show was limited to Ms. Vaughn's communication with her some six years prior about her conceptual idea. [*Id.* at 44-45.] As a result, Ms. Henderson-Hutchinson was not concerned that a conflict of interest existed when Ms. Vaughn was hired. [*Id.*] Ms. Vaughn never asked for Ms. Henderson-Hutchinson's consent or permission to create or produce the Show. [*Id.* at 15.] Ms. Vaughn concludes that based on Ms. Henderson-Hutchinson's knowledge of the Show's concept, Radio One waived of any conflict that might have existed. [Dkt. No. 72 at 5-6.]

Ms. Vaughn testified that in January or February 2013, she told Karen Vaughn that the Amos and Abdul Show was scheduled to launch on Channel 40. [Vaughn Dep. at 43-44.] Radio One claims that it first learned through a newspaper article of Ms. Vaughn's activities in developing the Show on February 14, 2013. [Williams Dep. at 40-41.] Ms. Vaughn, as the creator and executive director of the Show, was quoted in a February 14, 2013 Indianapolis Recorder article stating that "radio would do [Amos and Abdul] justice

7

but television is such a powerful medium and no better place to show them." [Vaughn Dep. at Ex. 9.]  After reading the news article, Mr. Williams contacted Ms. Vaughn and Mr. Brown to set up a meeting with them the following day to alert them to the conflict of interest created by their involvement with the Show.  [Williams Dep. at 44.]  Although Channel 40 broadcasts television programs and Radio One broadcasts radio programs, Mr. Williams contends that Channel 40 is a competitor of Radio One in that they both sell advertising.  [*Id.* at 50.]  Ms. Vaughn disagrees.[4]

After learning that Ms. Vaughn and Mr. Brown were planning to create and produce the Show, Radio One conferred with Channel 40 in an attempt to resolve the conflict of interest.  Radio One reports that it sought to co-promote the show with Channel 40 on the condition that any and all websites and social media would be owned by and controlled by Radio One.  [Williams Dep. at 44-48.]  This proposal was not accepted by Channel 40. [*Id.*][5]  Thereafter, on March 6, 2013, Radio One's legal counsel sent a cease and desist notice to Channel 40 demanding that Channel 40 refrain from broadcasting the Amos and Abdul Show.  [Kindall Decl. at ¶ 8, Ex. A-2.]

---

[4] Ms. Vaughn "does not concede that Channel 40 in Noblesville, Indiana is a competitor of any radio station, including Radio One [because] [r]adio and television are two completely different and unique media platforms."  [Dkt. No. 72 at 6.]  This unsubstantiated statement is insufficient to create a question of material fact and does not controvert Radio One's belief that Channel 40 is a competitor of Radio One.

[5] Ms. Vaughn contends, again without citing any evidence, that Mr. Williams "became impatient within days and broke off all negotiations with Channel 40."  [Dkt. No. 72 at 7.]  It is undisputed that Radio One and Channel 40 did not reach an agreement as to the production of the Show.

More than once Radio One requested that Ms. Vaughn relinquish ownership of the URLs and social media pages that incorporated the name and likeness of Mr. Brown. [Vaughn Dep. at 96-97 (Q. "You are [sic] asked on multiple occasions to transfer the URLs and social media sites over to Radio One for a period of over 30 days for four separate meetings, and you didn't do it, correct?  A.  Correct.  It didn't mean that I wasn't going to.").]  Radio One contends that its requests were a "clear requirement to resolve what Radio One identified to be a conflict of interest."  [Dkt. No. 65 (citing Williams Dep. at 59-60).]  Ms. Vaughn testified that she was willing to turn over the URLs but wanted Radio One to agree that she did not have a conflict of interest, she would not be fired, and if the Show would ever be syndicated on national television that she would receive a small percentage of profits.  She believed that Mr. Williams agreed to these conditions, but Mr. Williams said he was "just entertaining those things."  [Vaughn Dep. at 74-78; Dkt. No. 72 at 6-7 (Ms. Vaughn contends, without reference to any admissible evidence, that she purchased the URLs with her own funds and did not enjoy any personal gain from those assets).]  Ms. Vaughn claims that on February 16, 2012, she had the Facebook page and website for the Amos & Abdul Show taken down.  [Vaughn Dep. at 107-08.]  She did not, however, transfer ownership of the URLs and social media prior to her termination of employment.  [*See* Dkt. No. 79 at 3, n.4 (highlighting the distinction between simply "taking down" internet content with "transferring ownership" of the platforms on which the content is placed).]  We have not been informed which party, if any, currently owns the websites and social media.

On March 11, 2013, Ms. Vaughn was terminated from her employment with Radio One for refusing to transfer ownership of the URLs and social media to Radio One and for engaging in a conflict of interest.  [Vaughn Dep. at 127; Dkt. No. 79 at 3.]  Karen Vaughn explained to Ms. Vaughn that she was being terminated due to her "refusal to cooperate concerning [her] website" and "conflict of interest."  [Vaughn Dep. at 128.]  The decision to terminate Ms. Vaughn was approved by Jackie Kindall (Head of Radio One's Human Resources Department) in consultation with Daphne Webb (Radio One's Senior Human Resources Manager), Karen Vaughn (Program Director for WTLC FM, AM, and HHH), and Chuck Williams (General Manager).  [Williams Dep. at 34-35; Kindall Decl. at ¶¶ 2-6.]  Radio One contends that "[e]xcept for Chuck Williams, every other person involved in the termination decision was female."  [Dkt. No. 65 at 9 (citing Kindall Decl. at ¶ 5).]  After Ms. Vaughn's termination of employment, her position was not filled; Radio One instead divided her duties between two existing Radio One employees:  Kim Wells (female) and Cameron Ridle (male).  [Kindall Decl. at ¶ 11.][6]

Radio One disciplined Amos Brown for his involvement in the TV show by issuing a formal written warning.  [Kindall Decl. at ¶¶ 4, 10.]  Ms. Kindall explained that Mr. Brown was "contrite" when confronted about the conflict of interest resulting from his involvement in the Amos and Abdul Show and immediately agreed to withdraw from participating in the Show and to ask Ms. Vaughn to refrain from using his name and/or

---

[6] Ms. Vaughn argues that Radio One did not terminate her employment until after it "had stolen her complete concept and used her expertise to set up the show at Radio One."  [Dkt. No. 72 at 7.]  However, Ms. Vaughn provides no evidence to support this accusation.  [*Id.*]

likeness in promoting the Show.  [*Id.* at ¶ 4.]  Mr. Brown testified that when he was involved with the Show he did not believe his actions would redound to the detriment of Radio One.  [*See generally* Brown Dep.]  Had he believed they would, Mr. Brown stated he would never have met with representatives of Channel 40.  [*Id.* at 30]  According to Radio One, Mr. Brown "fully cooperated and promptly remedied his conflict of interest." [Kindall Decl. at ¶ 4.][7]

## Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *Id*. at 255.

---

[7] Ms. Vaughn points to the testimony of Ms. Henderson-Hutchinson regarding the progressive discipline policy at Radio One, noting Ms. Henderson-Hutchinson's position that the discipline policy applied equally to full time and part time employees.  [Dkt. No. 72 at 2-3.]  Ms. Vaughn contends that these facts "should be strongly considered by the Court when viewing the Defendant's inference that tenue and part-time versus full-time status should in some way excuse disparate application of policies and procedures between employees."  [*Id.* at 3.]  Radio One did not discuss in its briefing on the motion before us its progressive discipline policy.  In any event, Ms. Vaughn does not complain that Radio One's treatment of her with respect to the discipline policy is evidence of gender discrimination.  Moreover, Ms. Henderson-Hutchinson left her employment with Radio One on December 4, 2012, and thus was not involved in Radio One's termination of Ms. Vaughn's employment in 2013.  [Hutchinson Dep. at 14.]

However, neither the "mere existence of some alleged factual dispute between the parties," *Id.*, at 247, nor the existence of "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

## Analysis

### A.    Gender Discrimination.

Ms. Vaughn maintains that her termination of employment was wrongfully based on her gender. Title VII makes it unlawful for an employer to "discharge any individual,

12

or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. Our review of the evidence surrounding Ms. Vaughn's termination from her employment with Radio One does not support a finding of gender discrimination. Clearly, Ms. Vaughn disagreed with Radio One's decision to terminate her employment and regarded Radio One's request that she transfer ownership of her URLs and social media pages without compensation as unreasonable. However, no facts have been adduced that demonstrate that Radio One's decision to terminate her employment was motivated by Ms. Vaughn's gender. On this issue, no dispute of material fact exists, entitling Radio One to judgment as a matter of law.

Federal courts have established two analytical pathways by which a claimant can succeed in establishing a claim of gender discrimination: the direct method and the indirect method. Ms. Vaughn has sought to prove her claim of gender discrimination through indirect evidence of disparate treatment. [Dkt. No. 72 at 10.] A plaintiff may prove discrimination "indirectly" via the burden-shifting method utilizing the *McDonnell Douglas* framework. Under this approach, a plaintiff first bears the burden of setting forth a *prima facie* case for discrimination, which she may satisfy by showing that: "(1) [s]he is a member of a protected class, (2) [s]he met h[er] employer's legitimate job expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). If the plaintiff crosses this threshold, then the burden shifts to the

13

employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Morgan*, 724 F.3d at 996.

### 1.   Ms. Vaughn Has Not Established A *Prima Facie* Claim of Discrimination.

It is undisputed that Ms. Vaughn is a member of a protected class and that she suffered an adverse employment action.  Radio One maintains that Ms. Vaughn's gender discrimination claim fails as a matter of law because she cannot establish a *prima facie* case of discrimination because her job performance did not meet Radio One's legitimate expectations (element two) and Radio One did not treat any similarly situated male individual more favorably (element four).

Radio One argues that Ms. Vaughn was not meeting its legitimate expectations in that she violated the company's Conflicts Policy by engaging in unapproved and unauthorized competitive activities when she solicited Amos Brown to be featured on a competitor's television show and purchased URLs and social media pages to promote the Show.  [Dkt. No. 65 at 13.]  Upon notifying Ms. Vaughn that these actions with regard to the Amos and Abdul Show violated the Conflicts Policy, Ms. Vaughn failed to resolve the conflicts to Radio One's satisfaction (i.e., transferring ownership of the URLs and social media to Radio One).  After more than 30 days of failing to take the prescribed steps to resolve the conflict, Radio One terminated Ms. Vaughn's employment, which action was

consistent with the express terms of its Conflicts of Interest Policy. [*See* Vaughn Dep. at Ex. 7 at p. 2 ("Often, however, conflict situations require affirmative intervention by the Company to determine whether action on the part of the Company is warranted. Such action may include requiring the employee to fully divest himself or herself of the conflicting interest as a condition of continued employment. In certain circumstances, the Company may determine that an employee's conflict is irreconcilable or so inconsistent with the employee's duty of loyalty to the Company that termination of employment is the only reasonable remedy.").]

Ms. Vaughn has designated no evidence that refutes Radio One's assertion that her involvement with the Show constituted a conflict of interest or that she failed to comply with Radio One's corrective action. She argues that it was unfair of Radio One to demand ownership of the Show's URLs and social media without compensating her for those interests. She claims that her concept of the Amos and Abdul Show had been communicated to Radio One some six years prior to her employment through conversations with Ms. Henderson-Hutchinson. None of these facts, however, demonstrates that at the time of her termination she was performing to Radio One's legitimate expectations. Ms. Vaughn has failed to provide any evidence that contradicts Radio One's determination that she was in violation of the company's Conflicts Policy. Therefore, element two of a *prima facie* case of discrimination has not been satisfied. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).

Ms. Vaughn attempts to rely on the holding in *Peele v. Country Mutual Insurance Company*, 288 F.3d 319, 329 (7th Cir. 2002) as support for her conclusion that she "has

raised an inference that Radio One applied its legitimate employment expectations in a disparate manner" and thus "the second element merges into the fourth," thereby relieving her of the obligation to identify a comparator who was treated more favorably. [Dkt. No. 72 at 13.] This argument is a nonstarter because Ms. Vaughn has failed to designate any evidence demonstrating that she was fulfilling Radio One's legitimate expectations or that Radio One "applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male [] employees in a more favorable manner)." *See Peele*, 288 F.3d at 329. To the contrary, the evidence shows that Radio One enforced its Conflicts Policy consistently as to both Ms. Vaughn and Mr. Brown. Both employees were informed that their involvement with the Show violated the Conflicts Policy and steps needed to be taken to eliminate the conflict. Mr. Brown immediately severed his ties from the Show upon Radio One's request, while Ms. Vaughn failed to divest herself of the URLs and social media pages related to the Show.

To satisfy element four of a *prima facie* claim of gender discrimination, Ms. Vaughn must identify a male coworker who is directly comparable to her in all material respects who was treated more favorably. *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). This inquiry asks only whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment" and often hinges on whether co-workers "engaged in comparable rule or policy violations" and received more lenient discipline. *Id.*; *Naik*, 627 F.3d at 600 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)). The purpose of this analysis is to eliminate other possible explanatory variables, "such as

differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable" – discriminatory animus. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).  The Seventh Circuit has articulated a three-part test to guide a determination as to whether a plaintiff and comparator are similarly-situated: both must have (1) dealt with the same supervisor, (2) been subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.  *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (quoting *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002))).

Navigating through Ms. Vaughn's frequently unsupported facts, we are led to believe that she intends to compare herself to Amos Brown and Cameron Ridle,[8] both of whom were not terminated from their employment as a result of their involvement with the Amos and Abdul Show.  Ms. Vaughn describes in broad strokes the characteristics of Mr. Brown's and Mr. Ridle's employment in a faltering attempt to draw similarities between the qualities of her employment and various actions related to the Show.  The entirety of her response to Radio One's summary judgment motion is the following:

---

[8] Ms. Vaughn merely mentions Cameron Ridle's name in her Response Brief, noting that he "assisted with the Twitter and Facebook matters while an employee of Radio One."  [*See* Dkt. No. 72 at 8, 9.]  She does not identify Mr. Ridle's job responsibilities at Radio One, his experience, his supervisors, or the foundation for her belief that he received no disciplinary action for his involvement with the Amos and Abdul Show.  Given the extremely limited detail she provides about Mr. Ridle, we conclude that Mr. Ridle was not similarly-situated to Ms. Vaughn and cannot be a comparator for her *prima facie* case of discrimination.

17

Under the holding of *Orton-Bell*, as applied to the facts here, it should make no difference that Mr. Brown was a full-time employee of Defendant for 12 years while Ms. Vaughn was a part-time employee of Defendant for less than one year.  Defendant insists that such a distinction renders any finding that Ms. Vaughn and Mr. Brown are similarly situated as invalid.  **Both were employees of Defendant who were both alleged to have engaged in conduct that constituted a conflict of interest with respect to the development of The Amos and Abdul Show.  One employee, Ms. Vaughn, was terminated by Defendant; the other employee was not and a third (Riddle) [sic] received no discipline.**  Where an employee failed to meet expectations[] claims that she has been treated differently from a male employee who similarly failed to meet expectations, the second element merges into the fourth.  See *Peele v. Country Mutual Insurance Company*, 288 F.3d 319, 329 (7th Cir. 2002).  From the facts in this case, it is obvious that Plaintiff has raised an inference that Radio One applied its legitimate employment expectations in a disparate manner.

[Dkt. No. 72 at 13 (emphasis added).][9]

To the extent that Mr. Brown and Ms. Vaughn may at first blush appear to have been similarly situated employees, such that Radio One's more lenient disciplinary response to Mr. Brown as compared to Ms. Vaughn may implicate Title VII, the analysis simply does not hold up.  Even though both were involved with the conflicting Show, arguably violated the same policy, and dealt with the same Radio One management, and even though Mr. Brown was reprimanded whereas Ms. Vaughn was terminated, Mr. Brown's and Ms. Vaughn's employment responsibilities were clearly distinguishable and their responses to Radio One's conflict determination were drastically different.  Radio

---

[9] Radio One states in its Reply Brief that Ms. Vaughn compares her treatment to Abdul-Hakim Shabazz's treatment by Radio One.  [Dkt. No. 79 at 7.]  Ms. Vaughn does not actually compare herself to Ms. Shabazz.  Regardless, Mr. Shabazz was not and never has been an employee of Radio One.  [Kindall Decl. at ¶ 12.]

One lists eight undisputed differences between Ms. Vaughn's and Mr. Brown's employment that are unrelated to gender:

> Not only was Ms. Vaughn employed by Radio One for a significantly shorter time period than Mr. Brown, there are at least **eight** other material differences between Mr. Brown and Ms. Vaughn, including: (1) different job titles, (2) different duties and responsibilities, (3) different functions for the company, (4) different employment status (*i.e.*, full-time vs. part-time employment), (5) Mr. Brown being a host of his own radio show while Ms. Vaughn was responsible for merely reading news bits, (6) Ms. Vaughn's ownership of various URLs and social media pages for the TV Show that improperly used the name and likeness of Amos Brown compared to no such ownership by Mr. Brown, (7) Ms. Vaughn's refusal to transfer ownership in the URLs and social media compared to Mr. Brown's immediate actions to remedy his conflict, and (8) Ms. Vaughn's continued violation of Radio One's Conflicts of Interest Policy, up to and including the day she was terminated, compared to Mr. Brown's immediate and voluntary resolution of his conflict. (*See* Motion pp. 14–15.) Because *Orton-Bell* only addressed the length of employment between the plaintiff and her comparator and nothing more, it is inapposite to the analysis before this Court.

[Dkt. No. 79 at 6 (emphasis in original).][10]  Ms. Vaughn does not attempt to explain how in our analysis of the legal merits of her lawsuit we can ignore these differing job titles, duties and responsibilities, functions, and media presence in concluding that Mr. Brown was similarly situated to her.  Mr. Brown simply was not similarly situated to Ms. Vaughn, and we so hold.

Ms. Vaughn cites *Orton-Bell v. Indiana*, 759 F.3d 768 (7th Cir. 2014) in an attempt to minimize the ways in which she and Mr. Brown were differently situated in an effort to

---

[10] Ms. Vaughn acknowledges the difference between her actions and those of "complicit male employees because she refused to turn over ownership of the URLs and social media materials in question."  Despite her "taking down" the social media, she notes that Radio One chose not to punish the male employees who "assisted in the creation of the social media."  [Dkt. No. 72 at 7-8.]

convince us that Mr. Brown is a bona fide comparator.  In *Orton-Bell*, two Department of Corrections employees were terminated for engaging in an affair with one another and having sexual intercourse in the office.  *Id.* at 771-72.  The male employee (with 25-years of service) was permitted to settle with the DOC, allowing him to resign in good standing, keep all of his benefits (including his pension), and continue working at the prison as a contractor.  *Id.* at 772.  The female employee (who had been employed by the DOC for 2 years) was not offered a settlement and, after her appeal failed, she had difficulty obtaining unemployment benefits and could no longer work for the DOC.  *Id.*  The employees were "primarily differentiated by the fact that she was a counselor of two years and he was a twenty-five-year veteran of the DOC's Custody branch."  *Id.* at 777.  However, in that case the employees were fired by the same supervisor for the same conduct that violated the same standard from which decisions both appealed.  Thus, the court held that the male employee was similarly situated to the female employee.  *Id.*  The court held that more discovery was needed regarding the appeals process to provide additional detail as to the seemingly disparate treatment of a female employee during that process.  *Id.* at 778.

The *Orton-Bell* case does not compel a conclusion here that Mr. Brown was or is a suitable comparator for purposes of Ms. Vaughn's discrimination claim.  In *Orton-Bell* no explanation was provided for the more favorable treatment of the male employee other than their respective lengths of employment.  *Id.* at 777 (Both "were fired by the same supervisor for the same conduct that violated the same standard – and both appealed the termination . . . .").  Although Mr. Brown violated the same Conflict Policy as Ms. Vaughn and both were disciplined by the same supervisor (Ms. Kindall), reasons other than gender and

20

tenure explain the differing treatment (in addition to the enumerated reasons described above).  Most important in the context of the termination decision is that Ms. Vaughn failed to remedy her conflict of interest whereas Mr. Brown immediate ceased the offending conflict activity.  Unlike in *Orton-Bell*, Radio One has clearly articulated the reason for the disparate treatment, namely, the existence of a continuing conflict of interest.  *Orton-Bell* is thus inapplicable to the facts before us.

Ms. Vaughn's *prima facie* case of gender discrimination has failed based on her inability to prove that she was fulfilling the legitimate expectations of Radio One and that a similarly situated male coworker was treated more favorably.  As a result, Radio One is entitled to judgment as a matter of law on this claim.  *See Keller v. Ind. Fam. & Social Servs. Admin.*, 639 F. Supp. 2d 928, 939-42 (S.D. Ind. 2009) (granting summary judgment in favor of employer on gender discrimination claim where plaintiffs failed to carry burden of demonstrating a *prima facie* case of discrimination).

### 2.   Radio One Had A Legitimate, Non-Discriminatory Reason for Terminating Ms. Vaughn's Employment.

Even if we were to assume that Ms. Vaughn has or could meet her burden in establishing a *prima facie* showing of gender discrimination, she has failed entirely in responding to Radio One's non-discriminatory reason for terminating her, to wit, that she violated the Conflicts Policy, that she enlisted Mr. Brown for the Show, that she acquired URLs and social media using the name and likeness of Mr. Brown, and that she enlisted Mr. Ridle to assist with the Show's social media, all without Radio One's approval.  [*See* Request to Terminate Form dated Mar. 7, 2013, Dkt. No. 65-1 at Ex. A-1; *see St. Mary's*

21

*Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (defendant must produce evidence of its reasons for the adverse employment action that "*if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action") (emphasis in original).]

Ms. Vaughn has neither argued nor set forth any facts to support a conclusion that Radio One's reason for terminating Ms. Vaughn – an unresolved conflict of interest – was a pretext for gender discrimination.  In contrast, Radio One highlights that three of the four individuals involved in the decision to terminate Ms. Vaughn were *female*, suggesting that gender discrimination was simply not a factor in the termination of her employment. Further, Jacqueline Kindall, the executive who oversaw Radio One's Human Resources and performed as the ultimate decision-maker on disciplinary and termination of employment decisions, maintains that Ms. Vaughn's employment was terminated after Ms. Vaughn refused to cooperate with Radio One by relinquishing the Amos and Abdul Show websites.  [Kindall Decl. at ¶ 3.]  Finally, Ms. Vaughn's position was not filled by a newly hired male employee.  Rather, her duties were assumed by two current employees – one male and one female.

No evidence before us suggests that Radio One did not honestly believe its nondiscriminatory reason for Ms. Vaughn's termination.  "[E]ven if the business decision was ill-considered or unreasonable, provided that the decision maker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (citations omitted); *Coleman*, 667 F.3d at 852 (Plaintiff "must present evidence suggesting that the employer is

dissembling."); *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.") (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). Ms. Vaughn maintains that Radio One's demand that she turn over the social media she developed at her own cost without compensation was not, in her opinion, a valid reason for her termination. [Dkt. No. 72 at 6.] This may be true, but that belief alone does not prove that Radio One's decision was a pretext for discrimination. We do "not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined . . . ." *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) (citation omitted). Radio One's stated reason for terminating Ms. Vaughn's employment due to an unresolved conflict of interest is "not so outlandish as to suspect it is a lie." *See Johnson v. Seagram & Sons, Inc.*, 311 F. Supp. 2d 774, 781-82 (S.D. Ind. 2004). Ms. Vaughn has not demonstrated that her termination based on a conflict of interest was a pretext for discrimination. Radio One is entitled to judgment as a matter of law on this issue as well.[11]

## B.    Negligence.

Count 2 of Plaintiff's Complaint alleges that "Radio One was careless and negligent in that it failed to supervise its agents and representatives, to conduct in-service training in

---

[11] We note that Ms. Vaughn's Complaint asserts claims for both gender and race discrimination. The parties stipulated to the dismissal of Plaintiff's race discrimination claim on May 22, 2015. [*See* Dkt. Nos. 60, 66.]

race and gender sensitivity issues when it knew or should have known of the Title VII and other Civil Rights violations and to take reasonable and appropriate action." [Dkt. No. 1 at ¶ 26.] Radio One moved for summary judgment on Ms. Vaughn's negligence claim. Ms. Vaughn did not respond to Radio One's request for summary judgment on this claim, either in her response filed on July 22, 2015, or in the intervening time since Radio One noted her lack of response in its August 5, 2015 reply brief [Dkt. No. 79]. As a result, we conclude that Ms. Vaughn has abandoned her negligence claim and summary judgment is warranted in favor of Radio One as a matter of law. *McKnight v. City of Evansville*, No. 3:13-cv-147-SEB-WGH, 2015 WL 1268178, at *8 (S.D. Ind. Mar. 18, 2015) ("While the precise scope of Plaintiff's overt concession is not clear, the import of her failure to address any of Defendants' arguments for summary judgment is: she has abandoned all of her state-law claims and the civil rights conspiracy claim.") (citing *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999); *Reklau v. Merchs. Nat'l Corp.*, 808 F.2d 628, 630 n. 4 (7th Cir. 1986)).

## Conclusion

Ms. Vaughn has failed to provide evidence from which a reasonable jury could conclude that she was performing in accordance with Defendant's legitimate expectations and that Defendant treated similarly situated male employees more favorably than it treated her. Further, there is no evidence that Defendant's rationale for Ms. Vaughn's termination of an unresolved conflict of interest was pretextual. Finally, Ms. Vaughn has abandoned her negligence claim by failing to respond to Defendant's request for summary judgment.

We therefore **GRANT** Defendant's Motion for Summary Judgment on all aspects of

Plaintiff's lawsuit.  Final judgment shall enter accordingly.

Date: ___12/30/2015___

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Mary Beth Ramey
RAMEY & HAILEY
marybeth@rameyandhaileylaw.com

Richard D. Hailey
RAMEY & HAILEY
rich@rameyandhaileylaw.com

Brian P. Nally
REMINDER CO., L.P.A.
bnally@reminger.com

Andrew J. Dorman
REMINGER CO. L.P.A.
adorman@reminger.com